**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

JOHN BORGESE,

     Plaintiff,

       v.

DEAN FOODS COMPANY; WHITE WAVE
FOODS and/or JOHN DOE EMPLOYER,

     Defendants.

Civil No. 15-cv-2907 (RMB/KMW)

**OPINION**

**BUMB**, UNITED STATES DISTRICT JUDGE:

This matter comes before the Court on a motion for summary judgment by Defendant WWF Operating Company ("WhiteWave")[1] with regard to a cause of action by Plaintiff John Borgese ("Plaintiff") under the New Jersey Conscientious Employee Protection Act ("CEPA"). N.J.S.A. 34:19-1, et seq. For the reasons set forth below, the Court determines that Plaintiff is unable to establish the causation element of a prima facie CEPA claim, and thus WhiteWave is entitled to summary judgment.

---

[1] Defendant Dean Foods Company was voluntarily dismissed from this action prior to removal to this Court. (Notice of Removal, Ex. C) [Dkt. No. 1]. WWF Operating Company is currently listed on the docket as White Wave Foods.

# I.   STATEMENT OF FACTS

Plaintiff John Borgese was employed at WhiteWave, a manufacturer of non-dairy milks, as Chief Engineer of its Bridgeton, New Jersey plant ("the Plant") from March 2007 to February 2, 2015. (Def.'s Statement of Undisputed Material Facts ("DSUMF") & Pl.'s Response to DSUMF ("PSOF") at ¶¶ 1, 12, 86.) New Jersey law requires boiler operators to hold different levels of licenses, or seals. (Id. ¶ 4.) Plaintiff holds a red seal, which permitted him to serve as Chief Engineer of the Plant and oversee the boiler rooms. (Bodrog Dep. at 38:11-12.) The Plant operates 24 hours a day, seven days a week, and uses three boilers in total. (DSUMF & PSOF ¶¶ 2, 9[2].) The boilers are divided in rooms, with two boilers in one room and a third in another room. (Id. ¶ 9.) The total steam production requires the designation of a Chief Engineer with a certain level seal, which Plaintiff holds. (Id.)

Prior to applying for the position at WhiteWave, Plaintiff met with the then-Maintenance Manager of the Plant, Dave Boyce, to discuss the position. (Id. ¶ 13.) During this conversation, Plaintiff informed Mr. Boyce of his position as a full-time corrections officer at South Woods State Prison ("the Prison")

---

[2] Although Plaintiff disputes Paragraph 9 of the DSUMF, he does so only on the ground that the paragraph terms one of the three boilers as a "backup" boiler. Plaintiff does not appear to dispute the number.

with a schedule of 10:00 p.m. to 6:00 a.m.  (Id. ¶ 14.)
According to Plaintiff, the two men agreed that he could arrive
for work at WhiteWave after the end of his shift at the Prison
and work a shift from 6:30AM to 2:30PM.  (Id. ¶¶ 15-17[3].)

In 2009, Plaintiff commenced a series of complaints
regarding boiler compliance issues that are at the center of the
present action.  Plaintiff noted that WhiteWave was violating a
requirement for high pressure boilers that operators be within
sight and sound of the machinery at all times.  (Id. ¶¶ 23, 39[4].)
Plaintiff claims that an altercation he had with a production
supervisor in early 2009 was in response to his recent complaints
about supervision compliance with boiler regulations.  (Id. ¶
18.)  In a March 10, 2009 letter to WhiteWave Human Resources,
Plaintiff's attorney noted the altercation and that his client
heard "rumors" of possible changes that would "negatively effect
[sic] him in his position."  (Id. ¶ 19; Def.'s Br. in Support of
Summ. J. ("Def. Br."), Ex. E.)  Specifically, Plaintiff heard
rumors from "somebody that overheard it from somebody else" of
hour changes to a 2/2/3[5] schedule with 12-hour shifts.  (DSUMF &

---

[3] Plaintiff generally disputes these paragraphs of the DSUMF,
however does not dispute the fact that Plaintiff arrived for work
at these times.
[4] Plaintiff's response to Paragraph 39 of the DSUMF does not show
a genuine dispute as to the facts contained therein.
[5] "A 2/2/3 schedule means an employee works two days, has two
days off, and works three days, followed by a reverse of the

PSOF at ¶ 20.)  One former WhiteWave employee testified that the compliance complaints caused friction between Plaintiff and the company, and that the manager of the Plant, John Bodrog, tried to change Plaintiff's schedule as a result.  (Murphy Dep. at 50:17-51:2.)

While the March 10, 2009 letter did not explicitly reference the compliance complaints as the source of alleged retaliation, Plaintiff argues that the connection was implied and consistent with Plaintiffs' numerous compliance complaints noted in the record.  (PSOF ¶ 22.)  Despite Plaintiff's concern about these "rumors," his schedule did not change in 2009.  (DSUMF & PSOF at ¶ 21.)

Plaintiff next brought up compliance issues in a February 17, 2010 letter sent to then-Maintenance Manager Tom Powers and copied to Human Resources.  In the letter, Plaintiff noted that compliance with high pressure boiler regulations is mandatory per N.J.A.C. 12:90-3.10.  (Id. ¶ 23.)  About a week later, on February 23, 2010, Plaintiff wrote to Mr. Bodrog to note a "violation/integrity check" and an alleged threat to change Plaintiff's schedule.  (Id. ¶ 25.)

Although not explicit in his letter to Mr. Bodrog, Plaintiff claims he complained because Mr. Powers planned to implement a

---

schedule in which the employee has two days off, works two days, and has three days off."  (Perez Dep. 39:14-19.)

2/2/3 schedule, which would be untenable given Plaintiff's shifts at the Prison.  (Id. ¶¶ 26-28.)  Further, Plaintiff contended that the anticipated shift to a 2/2/3 structure would breach his agreement with WhiteWave for a specific schedule.  (Id. ¶ 30.)

At some point shortly after Plaintiff's February 17, 2010 letter, WhiteWave did implement the 2/2/3 schedule.  On March 8, 2010, Plaintiff's attorney, Robert S. Greenberg, Esq., wrote to WhiteWave, noting scheduling and compliance issues and that Plaintiff had informed him vaguely that job changes at WhiteWave were not in compliance with N.J.A.C 12:90-3.10.  (Id. ¶¶ 31-32.)  After working the 2/2/3 schedule for a few months, Plaintiff began splitting the 12-hour shift with another boiler operator, Chester Peterson, so that Plaintiff worked from just after 6:00AM to approximately 12:00PM.  (Id. ¶¶ 33-35.)  The record is devoid of any evidence indicating that WhiteWave disapproved of this shift-splitting or that Plaintiff was unable to make the arrangement work.

On June 10, 2010, an inspector from WhiteWave's insurance company conducted an annual inspection of the Plant.  (Letter from Anthony Fragale to John Borgese, June 14, 2010, Def. Br., Ex. J.)  In a June 14, 2010 letter to Plaintiff, in his capacity as Chief Engineer, the inspector cited a compliance issue with N.J.A.C. 12:90-3.10, noting,

> This location has 3 high pressure boilers
> located in 2 separate boiler rooms. At any
> time during production boilers in both boiler
> rooms can be placed into service. This would
> require at least 2 operators on duty, one per
> boiler room. At present there is only one
> operator on duty during any shift.

(Id.)  WhiteWave was given 60 days to come into compliance.
(DSUMF & PSOF at ¶ 40.)  Plaintiff had previously operated two
boilers, one in each room, simultaneously without calling in a
second operator, thus violating the regulation.  (Id. ¶ 41.)
Plaintiff contends that since he was not in management he was not
allowed to call in additional operators.  (PSOF ¶ 41.)

    Plaintiff claims that he spoke about compliance issues to
many managers, and that he had numerous conversations about these
issues with Mr. Bodrog over a three-year period, from 2007 to
2010.  (DSUMF & PSOF at ¶¶ 46-47.)   One such conversation with
Mr. Bodrog and Mr. Powers in 2010 resulted in two state
inspectors coming to the plant to explain the law.  (Borgese Dep.
at 140:8-24.)  The state inspectors noted that boiler engineers
must be within sight and sound of all high-pressure equipment
that they are operating.  (Id. at 143:20-23, 144:5-10.)  For
purposes of the Plant, according to Plaintiff, this means that in
order to operate Boiler 3 in conjunction with Boilers 1 or 2,
which are in a different room, there would need to be two
engineers.  (Id. at 143:24, 144:1-2.)  WhiteWave notes that when
such a situation arose, it tried its best to call in a second

operator, and that Plaintiff is unable to recount a time when he
operated boilers in two different rooms simultaneously after the
inspectors came to the Plant in 2010.  (DSUMF & PSOF at ¶ 44;
Borgese Dep. at 145:19-146:4.)  After 2010, Plaintiff failed to
send any additional letters regarding compliance to the company
because, in his words, "everybody that was involved was also
already aware of it, the compliance issues."  (DSUMF & PSOF at ¶
48.)

Other than Plaintiff's already-lodged concerns about boiler
regulation compliance at WhiteWave, Plaintiff appears to have
worked without issue over the next four years.  The next issue,
according to Plaintiff, arose in May 2014, when Mr. Peterson went
on medical leave, rendering Plaintiff unable to split his 12-hour
shift.  (Id. ¶ 49.)  Following Mr. Peterson's departure,
Plaintiff and the other operators began to cover his shifts,
deviating from the 2/2/3 schedule.  (Id. ¶ 50.)  The more
demanding work schedule caused Plaintiff to experience medical
issues, including heart palpitations.[6]  (Id. ¶ 51; Borgese Dep.
at 254:6-8.)  Eventually, in late July 2014, Plaintiff's
physician recommended he take two weeks of leave.  (Id. ¶ 52.)

---

[6] In the PSOF, Plaintiff clarifies that his medical issues arose
from the "emotional and medical impact" of WhiteWave failing to
properly cover the monitoring of the boilers.  (PSOF at ¶ 51.)
The Court is unsure this genuinely disputes the issue, but as it
must, considers the disputed facts in the light most favorable to
Plaintiff.

Plaintiff ultimately did not follow this recommendation, but satisfied his physician by having a heart ultrasound over the weekend. (Id. ¶ 53.)

It was during this time that Plaintiff began correspondence with WhiteWave Human Resources Manager, Mayra Perez. On July 27, 2014, Plaintiff sent Ms. Perez an email complaining that he had worked nineteen days in a row. (Id. ¶ 54.) Ms. Perez forwarded the correspondence to Mr. Bodrog and then-Maintenance Manager Ralph Eskilson, identifying the number of consecutive days as an issue. (Id. ¶¶ 55-56.) Ms. Perez also indicated that changing Plaintiff's schedule to a 2/2/3 would provide days off. (Id. ¶ 56.) In his same-day response to Ms. Perez, Mr. Bodrog inquired whether the consecutive days included just WhiteWave or if they were between both of Plaintiff's jobs, including with the Prison. (Id. ¶ 59[7].) Mr. Bodrog also wrote, "We now need to put a stake in the ground and go forward with the 223 schedule." (Email from John Bodrog to Mayra Perez, July 28, 2014, Def. Br., Ex. L.) According to Mr. Bodrog, a shift to that structure would align the boiler operators' schedules with those of the rest of the Plant, which he testified had operated on a 2/2/3 schedule

---

[7] Plaintiff argues that this factual assertion put forth by WhiteWave "cannot be understood." (PSOF ¶ 59.) Plaintiff has not genuinely disputed that Mr. Bodrog asked whether Plaintiff's report of 19 days of consecutive work applied to Plaintiff's work at WhiteWave or Plaintiff's work at WhiteWave and the Prison.

since April 2006.  (DSUMF & PSOF ¶¶ 57, 61[8]; Bodrog Dep. at 142:5-20, 146:10-11.)

Plaintiff followed up on the scheduling matter on August 7, 2014, when he exchanged emails with Ms. Perez and Mr. Eskilson. (DSUMF & PSOF ¶ 62.)  He again communicated via email with Ms. Perez on August 18, 2014, noting that he planned to write her about "scheduling,compliance,ethics [sic] and other related issues."  (Id. ¶ 63.)  Plaintiff claims that he continued to bring up concerns about boiler compliance during this period. (Id. ¶ 64.)

Following this correspondence, scheduling changes occurred. In September 2014, just weeks after Mr. Bodrog's email to Ms. Perez encouraging a 2/2/3 schedule, the new scheduling structure was implemented for all boiler operators.  (Id. ¶ 65.)  This change required Plaintiff to arrive at 6:00 a.m. and work until 6:15 p.m., making a total of approximately 20 hours of work each day between his two jobs.  (Id. ¶¶ 65-66.)  Just a few weeks into

_____

[8] Although Plaintiff purports to deny Paragraph 61 of the DSUMF, the PSOF does not address the allegation contained therein which states: "Because the rest of the plant ran on a 2/2/3 schedule, with the day shift starting at 6:00AM and ending at 6:15PM, the change in shift structure would place the boiler operators on the same schedule as the other employees at the plant."  (DSUMF ¶ 61.)  In response, Plaintiff only contends that "It is obvious from the record that the boiler engineers were not on and did not have to be on a 12 hour shift, 223 schedule."  (PSOF ¶ 61.) Indeed, Plaintiff admits, at least, that a shift to a 2/2/3 schedule would cause boiler engineers to match up with the maintenance department.  (Id.)

this new schedule, on October 1, 2014, Plaintiff wrote Ms. Perez, Mr. Bodrog, and Mr. Eskilson to express discontent with his 6:00 a.m. start time and that the new schedule was having a negative impact on him.  (Id. ¶¶ 67-68.)  Plaintiff also noted that he wished to return to his 6:30 a.m. to 2:30 a.m. schedule.  (Id. ¶ 68.)

Shortly after the October 1, 2014 email exchange, Plaintiff called out of work from October 6, 2014 to October 9, 2014; then, on October 10, 2014, Plaintiff notified WhiteWave that he sought medical leave under the Family and Medical Leave Act for severe migraines.  (Id. ¶¶ 70-71.)  On October 13, 2014, Ms. Perez forwarded Plaintiff the proper paperwork, which he returned in a timely manner.  (Id. ¶¶ 71-72[9].) The paperwork notes that if the leave is approved, the starting date is October 6, 2014, or the first date Plaintiff called out of work.  (FMLA Paperwork, Oct. 13, 2014, Def. Br., Ex. P.)  Plaintiff's FMLA request was approved on November 3, 2014, and Ms. Perez notified him of the approval via email on November 17, 2014.  (DSUMF & PSOF at ¶¶ 72[10]-73.)  On January 5, 2015, Ms. Perez notified Plaintiff via email that his FMLA leave had been expired as of December 29,

---

[9] Plaintiff does not dispute that the paperwork was returned in a timely manner.
[10] Plaintiff concedes that he was advised of his approval on November 17, 2014.

2014. (Id. ¶¶ 75[11]-76.) Plaintiff seems to take issue with notice of his delinquent return arriving days after his date to return, and he contends that had he been notified of the exhaustion of his FMLA leave prior to the date of expiration, he would have sought medical clearance to return to work before the expiration date. (PSOF at ¶ 77.) Nevertheless, Plaintiff's physician cleared him to return to work on January 15, 2015, yet Plaintiff failed to return to the plant on that date, as well. (Id. ¶¶ 77-78.)

When Plaintiff did not return to work on January 15, 2015, WhiteWave designated a new Chief Engineer with proper licensing on the day shift. (Id. ¶¶ 78-79.) WhiteWave subsequently notified the State of New Jersey of the change in personnel, as required by law. (Id. ¶ 79.) As the second day shift had been filled by another employee, WhiteWave offered Plaintiff a night shift as a boiler operator. (Id. ¶¶ 82-83.) Plaintiff still held his position at the Prison and thus was unable or unwilling to work a night shift at the Plant. (Id. ¶ 84.) After having failed to return to work from his FMLA leave, Plaintiff's employment at WhiteWave was terminated on February 2, 2015. (Id. ¶ 86.)

---

[11] Plaintiff disputes that he had exhausted his leave on this date, but does not dispute that he was informed he had exhausted his leave on this date.

Plaintiff brings the present action under the New Jersey Conscientious Employee Protection Act ("CEPA"), alleging that he was constructively discharged as a result of his series of compliance complaints.  Plaintiff commenced the action on March 13, 2015 against WhiteWave in the Superior Court of New Jersey, Cumberland County, Law Division.  On April 23, 2015, WhiteWave removed the action to this Court pursuant to Federal Rules of Civil Procedure §§ 1332, 1441, 1446(d).  28 U.S.C. §§ 1332, 1441, 1446(d).  On October 17, 2016, WhiteWave filed a motion for summary judgment, which the Court will now address.

## II.   **STANDARD OF REVIEW**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  Id.  When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party."  Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, a mere "scintilla of evidence," without more, will not

12

give rise to a genuine dispute for trial.  <u>Anderson</u>, 477 U.S. at 252.  Further, a court does not have to adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them.  <u>Scott v. Harris</u>, 550 U.S. 373, 380 (2007).  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  <u>Anderson</u>, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).  The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment.  <u>Orsatti v. N.J. State Police</u>, 71 F.3d 480, 484 (3d

Cir. 1995); <u>Jackson v. Danberg</u>, 594 F.3d 210, 227 (3d Cir. 2010)
(citing <u>Acumed LLC v. Advanced Surgical Servs., Inc.</u>, 561 F.3d
199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not
defeat summary judgment.").

### III. DISCUSSION

The issue in this summary judgment motion is whether
Plaintiff has proffered enough evidence to state a <u>prima facie</u>
claim under CEPA, and if so, whether a reasonable factfinder
could determine that WhiteWave's stated reason for Plaintiff's
termination is pretextual.

When evaluating claims under CEPA, courts in New Jersey
employ the familiar burden-shifting analysis established for
discrimination claims in <u>McDonnell Douglas Corp. v. Green</u>, 411
U.S. 792 (1973). <u>See</u> <u>Turner v. N.J. State Police</u>, No. 08-5163
(KM) (JBC), 2017 U.S. Dist. LEXIS 48036, at *29 (D.N.J. Mar. 29,
2017) (citing <u>Winters v. N. Hudson Reg'l Fire & Rescue</u>, 212 N.J.
67, 90 (2012)). Under this analysis, once a plaintiff has
established a <u>prima facie</u> case, the burden shifts to the
defendant to provide a legitimate, non-retaliatory reason for the
adverse employment action. <u>Id.</u> at *30. If the defendant is able
to proffer such a reason, then "the presumption of retaliatory
discharge created by the prima facie case disappears and the
burden shifts back to the [employee].'" <u>Id.</u> (quoting <u>Blackburn
v. United Parcel Serv., Inc.</u>, 179 F.3d 81, 92 (3d Cir. 1999)).

14

The plaintiff then bears the burden of persuasion to convince a reasonable fact-finder that the reason provided by the defendant was a pretext for retaliation.  Id.

For purposes of this case, WhiteWave seeks summary judgment because, it argues, Plaintiff is unable to demonstrate causation and thus establish a prima facie CEPA claim.  Further, WhiteWave argues, even if Plaintiff can show a prima facie claim, his claim cannot survive the McDonnell Douglas burden-shifting analysis to show that Defendant's decision to terminate Plaintiff for his failure to return from FMLA leave is a pretext for retaliation against him due to his compliance concerns. The Court holds that Plaintiff is unable to meet his burden for a prima facie claim, and therefore the Court need not reach the issue of pretext.

To survive a motion for summary judgment, a plaintiff must fulfill all four elements of a prima facie CEPA claim.  He must show that: (1) he reasonably believed the defendant engaged in conduct or practices that violated a law or regulation; (2) he performed whistleblowing activity protected under CEPA; (3) he suffered an adverse employment action; and (4) there exists a causal connection between the protected activity and the adverse action.  Bowen v. Parking Auth. of Camden, No. 00-5765 (JBS), 2003 U.S. Dist. LEXIS 16305, at *62 (D.N.J. Sep. 18, 2003) (citing Blackburn v. United States, 179 F.3d 81, 92 (3d Cir. 1999).  Here, both parties agree that Plaintiff has shown enough

evidence to satisfy the first three elements of a prima facie
CEPA claim. Therefore, for purposes of deciding if summary
judgment is appropriate, this Court evaluates only the causation
element of the CEPA claim.

A plaintiff may show causation "through temporal proximity
between the protected activity and the adverse employment action;
an intervening pattern of antagonism; or the evidence taken as a
whole." Barton v. MHM Corr. Servs. Inc., 454 F. App'x 74, 78-79
(3d Cir. 2011) (citing Farrell v. Planters Lifesavers Co., 206
F.3d 271, 280-81 (3d Cir. 2000). Here, Plaintiff does not rely
upon temporal proximity, and instead seeks to put forth
sufficient evidence to allow an inference of causation through a
pattern of antagonism or the evidence in its totality. (Pl. Br.
at 41-42.)

As an initial matter, the Court notes that Plaintiff has not
adduced any direct evidence of retaliation, thus the Court must
determine if the circumstantial evidence justifies an inference.
See Bocobo v. Radiology Consultants of S. Jersey, P.A., No. 02-
1697 (JEI), 2005 U.S. Dist. LEXIS 29321 at *13-14, aff'd, 477
Fed. App'x 890 (3d Cir. 2012) (citing Zaffuto v. Wal-Mart Stores,
Inc., 130 Fed. App'x 556, 569 (3d Cir. 2005); (Pl. Br. at 41-
46.). Plaintiff points to a variety of circumstantial evidence
that, Plaintiff argues, demonstrates a pattern of antagonism or
retaliatory animus that supports an inference of causation. This

evidence includes the consistency of Plaintiff's sole complaint, Mr. Murphy's testimony that "tension" existed between the parties, the pecuniary interests of WhiteWave to get rid of a "complaining" employee, and scheduling changes as retaliation for compliance complaints.  (Pl. Br. at 43-47.)  The Court will address each in turn, but ultimately determines that none of these – even taken together – establishes causation to survive summary judgment.

Plaintiff first attempts to show a pattern of antagonism by referencing his many compliance complaints throughout his employment at WhiteWave.  (Pl. Br. at 44-45.)  Defendant, in its brief, attacks this argument by relying on the District Court's and Third Circuit's analyses in Bocobo.  In Bocobo, the court determined that the plaintiff radiologist could not demonstrate a pattern of antagonism by simply pointing to a string of complaints over a 15-year period.  Bocobo, 2005 U.S. Dist. LEXIS 29321 at *15.  As the court noted, "Bocobo provides no evidence explaining why, after 15 years, [the employer] was finally motivated by those particular [regulatory compliance] complaints to terminate him."  Id. at *16.  Rather, the court observed, the plaintiff's termination resulted from his difficult personality. Id.  The court granted summary judgment and that decision was affirmed by the Third Circuit.  Bocobo v. Radiology Consultants of S. Jersey, P.A., 477 F. App'x 890, 903 (3d Cir. 2012).

Here, Plaintiff strains to find a distinction between his predicament and that of Mr. Bocobo. Plaintiff argues that unlike in Bocobo, where the plaintiff failed to identify specific regulations he complained were being violated, the present case focuses on one consistent compliance complaint over the course of many years. (Pl. Br. at 44.) Although it is true that the plaintiff in Bocobo complained about more than one thing over fifteen years, 2005 U.S. Dist. LEXIS 29321 at *15, the Court views this distinction as irrelevant. Nowhere in Bocobo did either court opine on the specificity or multitude of the plaintiff's complaints, instead the courts hinged their analysis on the fact that an inference of causation is undermined when an oft-complaining employee engaged in such conduct for years without consequence. In the end, Plaintiff fails to effectively distinguish the persuasive reasoning of Bocobo.

The Court finds the similarities between Bocobo and this case significant. Plaintiff has not submitted any evidence or even reasoning to explain why WhiteWave would treat a compliance complaint in 2014 different than it did in 2009 or 2010. Rather, a fair reading of the record is that WhiteWave did not view the potential boiler compliance issue with the same alarm that Plaintiff did. Moreover, and notably, Plaintiff cannot recall an incident where he operated two boilers at once after the insurance inspector noted the issue in 2010. Thus, the Court

determines that there is not sufficient evidence in the record to determine causation based on Plaintiff's complaints over the years. Simply put, Plaintiff "provides no evidence explaining why, after [four] years, [WhiteWave] was finally motivated by those particular [] complaints to terminate him." Bocobo, 2005 U.S. Dist. LEXIS 29321 at *16.

Plaintiff also argues that a pattern of antagonism is demonstrated through the "friction" present in his relationship with WhiteWave. (Pl. Br. at 45.) Plaintiff relies upon the testimony of Harmon Murphy to substantiate this proposition. Mr. Murphy worked at WhiteWave as a boiler engineer from 2011 to 2012. (Murphy Dep. 51:14-16.) While training Mr. Murphy on boiler compliance, Plaintiff mentioned that he had previously complained to Mr. Bodrog about "sight and sound" violations. (Id. at 49:9-22.) According to Mr. Murphy, these previous complaints caused friction between Plaintiff and Whitewave:

> Q: You mentioned that Mr. Borgese had been treated differently after he complained?
>
> A: Yeah, you could tell there was a change in the atmosphere.
>
> Q: Tell me about that. How was there a change in the atmosphere?
>
> A: You could just tell by scheduling and because they always kind of worked with him and then you could tell that they were moving toward having all engineers be maintenance approved also.

(Id. at 50:17-51:2.)  According to Plaintiff, Mr. Murphy's

testimony serves as sufficient evidence of a pattern of

antagonism.  (Pl. Br. at 45.)  The Court disagrees.

While Mr. Murphy may have sensed tension "in the atmosphere"

between the parties, other parts of his testimony undermine

Plaintiff's reliance on it.  Importantly, Mr. Murphy did not ever

witness Plaintiff complain to management or interact with

management on the issue of compliance:

> Q: Did you ever actually see him complain or
> hear [Mr. Borgese] complain, yourself, to Mr.
> Bodrog?
>
> A: I've seen where they have conversations,
> but not where I can hear he had a
> conversation, no.
>
> Q: You would just see them talking to each
> other?
>
> A: Yeah.
>
> Q: You don't know what they were talking
> about?
>
> A: No.

(Id. at 50:5-16.)  Without overhearing the interactions between

Plaintiff and management in 2011 and 2012, Mr. Murphy's apparent

feeling of friction seems to stem from Plaintiff's own

description of previous events that happened prior to Mr.

Murphy's employment with WhiteWave and relayed to him by

Plaintiff.  Moreover, even accepting the foundation of his

testimony of this friction in the air, Mr. Murphy did not cite

any instance in which he witnessed WhiteWave retaliating or
attempting to retaliate against Plaintiff.  When describing how
he perceived WhiteWave to be retaliating against Plaintiff
through shift changes, Mr. Murphy could not isolate Plaintiff's
treatment from broader business decisions:

> Q: And how did Mr. Borgese's schedule change
> in the time you worked with him?
>
> A: Well, I think before they had him working
> eight hours and then they was [sic] trying to
> convert him to 12 and it was all kind of
> scheduling stuff.
>
> Q: And what year was that that they were
> doing that?
>
> A: In between that time I guess of – between
> '11 and until the time I left.
>
> Q: So in the '11 to '12 range?
>
> A: Yeah.
>
> Q: And were they trying to change anybody
> else's shift during that time?
>
> A: What do you mean trying to change –
>
> Q: Well, you mentioned that they were trying
> to move him from an eight hour to a 12 hour –
>
> A: Well, they were trying to change us up to
> 12 hours and they knew he couldn't
> accommodate that because of the hours that he
> worked at the other job.

(Id. at 51:6-52:2.)  Essentially, Mr. Murphy contends that the
friction was evidenced through scheduling decisions affecting all
boiler operators.  Other than the fact that Mr. Murphy believes

WhiteWave was aware of the work schedule for his second job, Mr. Murphy provides no testimony from which it could be determined that the shift change was a punishment for Plaintiff's complaints. Mr. Murphy testified about Plaintiff's compliance complaints on one hand and the purportedly punitive schedule change on the other, but he provides no evidence that connects the dots between the two occurrences. Allegations of unspecified "friction" in the air simply do not connect the dots because they are based on conversations that Mr. Murphy admits he did not even hear.

Moreover, Mr. Murphy's unsubstantiated allegation that WhiteWave undertook a position-wide scheduling change with the specific purpose to punish Plaintiff by scheduling him for shifts "they knew he couldn't accommodate" is directly contradicted by the fact that WhiteWave accommodated Plaintiff's scheduling needs by allowing him to split his shift with Mr. Peterson, an arrangement that permitted Plaintiff to continue working two jobs **for years** until Mr. Peterson left. (DSUMF & PSOF at ¶¶ 33-35.) Further, as noted by Plaintiff's own Human Resources expert, Plaintiff was viewed as a model employee and received no negative employment reviews while employed at WhiteWave, even at the times he was complaining and "friction" allegedly existed. (Expert Report of Dawn A. Haag-Hatterer); cf. Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993) (finding a pattern of

antagonism through the "constant barrage of written and verbal warnings" filed against the plaintiff by defendant employer). Thus, even viewing Mr. Murphy's deposition testimony in the light most favorable to Plaintiff, the Court finds that it is nothing more than speculation that one could just "sense it in the air" that Plaintiff was being retaliated against through scheduling. This guesswork by Mr. Murphy, which he admits was not based on any actual interaction he had with WhiteWave, is insufficient to establish causation through a pattern of antagonism. See Scull v. Wackenhut Corp., No. 10-4633 (RMB/AMD), 2012 U.S. Dist. LEXIS 72447, at *19 (D.N.J. May 24, 2012) ("Mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment.") (citing Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995)).

Plaintiff also points to the pecuniary interests of WhiteWave as a basis for inferring causation. Specifically, the costs associated with hiring additional operators to come into compliance, Plaintiff argues, demonstrate a "clear motivation to quash Plaintiff's complaints." (Id.) Further, Plaintiff notes that discovery of the violations would subject WhiteWave to fines, which, Plaintiff argues, further demonstrates economic motivation. (Id.) The Court finds that this argument fails to establish causation and cannot defeat summary judgment for a number of reasons. Primarily, Plaintiff cites to no case law

supporting the contention that causation can be inferred from this hypothetical economic interest, which would be conjecturally present in practically any case alleging a violation of CEPA.[12] There is also no evidence in the record to suggest that WhiteWave even engaged in this type of cost-benefit analysis of whether it made fiscal (if unethical) sense to fire Plaintiff in lieu of coming into compliance.  Certainly, the record does not dispute the fact that Plaintiff continued to work there for years after he made his complaints known, despite Plaintiff's suggested pecuniary windfall to WhiteWave if it fired him to hush up the allegations.  To the extent that Plaintiff contends that it would be obvious for an employer to engage in such a cost-benefit analysis, it is certainly true that the termination of Plaintiff's employment did not absolve WhiteWave of the responsibility to come into compliance, if needed.  This was a fact that had been pointed out to WhiteWave by its insurer four years prior.  (Def. Br., Ex. J.)  The Court views Plaintiff's causal argument on this point to be speculative at best and unable to defeat summary judgment.

---

[12] "The purpose of the CEPA is 'to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'"  Choy v. Comcast Cable Communs., 629 F. App'x 362, 364 (3d Cir. 2015) (quoting Abbamont v. Piscataway Bd. of Educ., 650 A.2d 958, 971 (N.J. 1994).

Finally, Plaintiff argues that WhiteWave's alleged mismanagement of his FMLA leave is part of the pattern of antagonism allowing for an inference of causation.[13] (Pl. Br. at 46.) The Court disagrees. Plaintiff contends that WhiteWave provided inadequate notice as to the start and expiration of his leave, relying on expert testimony to show WhiteWave deviated from professional standards. (Id.) Specifically, as set forth above, Plaintiff argues that the following language from Ms. Perez's letter, dated October 13, 2014, did not clearly explain to him that his leave would end on December 29, 2014:

> You have informed us you will need to be out of work beginning October 6, 2014 due to a medical condition . . .
>
> The Family Medical Leave Act (FMLA) entitles eligible employees to an unpaid leave of absence for up to 12 weeks (in any 12-month period) for a serious health condition . . .
>
> The completed Certification serves as both your application for FMLA leave and as supportive documentation for the leave.

---

[13] The Court takes this opportunity to note that Plaintiff has elected not to bring a breach of contract cause of action nor an FMLA interference cause of action, despite frequent allegations throughout his briefing that his contractual right to a specific shift was trampled and that his FMLA process was deliberately mishandled. (Compl., Notice of Rem., Ex. B; Def. Br. at 46.) Although Plaintiff sought to amend the complaint to state a cause of action under the FMLA, such request was denied. (Mar. 3, 2017 Order.) Plaintiff failed to appeal the March 3, 2017 Order within fourteen days as required under Federal Rule of Civil Procedure 72. Fed. R. Civ. P. 72.

(FMLA Paperwork, Oct. 13, 2014, Def. Br., Ex. P.) Further, Plaintiff argues that WhiteWave's failure to offer him his same position and shift upon return from FMLA leave should be construed as retaliatory in nature because WhiteWave was aware Plaintiff would be unable to accept a night shift. (Id.)

These occurrences are insufficient to permit a factfinder to find that Plaintiff's protected activity was causally related to his adverse employment action. While Plaintiff lists this litany of grievances regarding his FMLA leave, he fails to effectively explain how these grievances, which took place in 2014 and embody the adverse employment action of which Plaintiff complains, (Pl. Br. at 42-43), are part of a pattern of antagonism reaching as far back as his initial 2009 compliance complaint. Put differently, instead of showing that his adverse employment action is causally linked to his temporally-remote protected activity by pointing to a series of connecting antagonistic skirmishes in the intervening years, he argues that the very fact that he ultimately suffered an adverse employment action is evidence that the action was caused by the protected activity. Such reasoning would obviate the need to ever show causation, as it would be automatically established by the existence of an adverse employment action. None of the above occurrences evidences any pattern of antagonism that connects Plaintiff's complaints to his termination from WhiteWave.

At the outset of his summary judgment briefing, Plaintiff urges the Court to view the case as theater and consider the entire performance rather than the isolated scenes. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990). Doing so, however, shows exactly why Plaintiff has not demonstrated causation under any standard. As explained supra, considering the entirety of the record does not indicate animosity or antagonism between the parties from 2010 to 2014, indeed, it contradicts any such notion. Despite Plaintiff's contention that he was complaining consistently throughout that time period or that everyone knew he had a standing complaint regarding the operation of the boilers, his scheduling was manageable for him, his performance was well-regarded, and he felt no need to file a formal complaint. This equilibrium was ultimately disturbed not by WhiteWave's conduct, but rather by the absence of Mr. Peterson, which threw everything about Plaintiff's scheduling into flux. The circumstances surrounding the four-year détente between the parties fatally undermines the essential prima facie element of causation, even when considering Mr. Murphy's testimony. This is true whether the Court views the facts under the "pattern of antagonism" or "totality of the circumstances" lens. Thus, this Court finds that Plaintiff fails to establish a prima facie CEPA claim. Summary judgment for WhiteWave is proper.

## IV.  CONCLUSION

As discussed above, the Court finds that Plaintiff is unable to establish a <u>prima facie</u> case under CEPA due to a lack of causation.[14]  For the foregoing reasons, the Court will **GRANT** WhiteWave's motion for summary judgment.  An appropriate Order and Judgment shall be issued on this date.

DATED: <u>JUNE 26, 2017</u>

<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

---

[14] The operative complaint purports to bring a second cause of action for "punitive damages" premised on the violation of CEPA. Disregarding the fact that this is not a properly pled as a separate cause of action, <u>see</u> <u>Ali v. D.O.C.</u>, Civ. A. No. 08-2425(FSH), 2008 WL 5111274, at *13 (D.N.J. Nov. 25, 2008) ("Punitive damages are a remedy available for certain causes of action and not an independent substantive cause of action . . . .") (citing <u>Hassoun v. Cimmino</u>, 126 F. Supp. 2d 353 (D.N.J. 2000)), where Plaintiff does not establish liability under CEPA, punitive damages certainly cannot flow.